UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SUSAN HOENING,                                  Civil No. 01-2057 (JRT/FLN)

    Plaintiff,

    v.

JO ANNE B. BARNHART,                            **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

    Defendant.

---

Daniel S. Rethmeier, for Plaintiff.
Lonnie Bryan, Assistant United States Attorney, for the Government.

---

Plaintiff Susan Hoening seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for Supplemental Security Income ("SSI"). See 42 U.S.C. § 1382. The matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment [Docket Numbers #41 and #45]. For the reasons set forth below, the Court recommends that the application be remanded to the Commissioner for further review consistent with this Report and Recommendation.

**I. INTRODUCTION**

Ms. Hoening applied for SSI on November 29, 1999, alleging an onset date of May 8, 1982. (Tr. 115-118). Ms. Hoening claimed that she was disabled because of rheumatoid arthritis, osteoporosis, low blood sugar, bad eyesight, and allergic reactions. (Tr.59-60, 129). The Social


Security Administration denied the application initially and upon reconsideration. (Tr. 59-60, 60-62). Ms. Hoening timely filed a request for a hearing, which was held before Administrative Law Judge ("ALJ") Diane Townsend-Anderson on February 12, 2001. (Tr. 82, 85). ALJ Townsend-Anderson rendered an unfavorable decision dated April 24, 2001. (Tr. 63-73). Ms. Hoening initiated this action in federal court seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). [Docket No. 1]. Upon motion by Defendant, this Court remanded the case to the Commissioner for further administrative proceedings pursuant to sentence 6 of § 250(g) and 1631(c)(3) of the Social Security Act, Title 42 U.S.C. § 405(g) and 1383(c)(3). [Docket No. 21] (Tr. 104).

Upon remand, the Social Security Administration Appeals Council vacated the decision of ALJ Townsend-Anderson and the Commissioner's final decision and remanded the case to ALJ Paul D. Tierney. (Tr. 102-04, 30). ALJ Tierney held a hearing on July 15, 2003, and rendered an unfavorable decision on September 23, 2003. (Tr. 30, 16-28). Ms. Hoening's appeal to the Appeals Council was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 12-13). See also 20 C.F.R. § 404.981. On August 8, 2005, Defendant moved to reopen this case in federal court. [Docket No. 29].

Ms. Hoening moved for summary judgment on November 1, 2005. [Docket No. 41]. Defendant also moved for summary judgment on December 16, 2005. [Docket No. 45]. Ms. Hoening argues that the ALJ's decision should be overturned for three reasons: 1) the ALJ and Appeals Council failed to properly analyze the medical evidence and failed to consider all medical evidence in determining Ms. Hoening's residual functioning capacity ("RFC"); 2) the ALJ and the Appeals Council erred by failing to afford credibility to Ms. Hoening's subjective complaints of pain

and failed to recognize Ms. Hoening's significant impairments as documented by substantial evidence on the record as a whole; and 3) the ALJ failed to offer the vocational expert a valid and complete hypothetical and because of this failed to find vocational incapacity. The Court agrees in part with Ms. Hoening's first contention and finds that the ALJ's finding of RFC is not supported by substantial evidence.

## II. STATEMENT OF FACTS

### A. Background

Ms. Hoening was born on February 6, 1952, and was 47 at the time of her application for benefits. (Tr. 34). She was five feet, seven inches tall and weighed 150 pounds. (Tr. 34). Ms. Hoening is a high school graduate with additional training as a nurse's aide. (Tr. 135). She worked previously as a nurse's aid but has not worked since 1983. (Tr. 37, 130).

### B. Medical Evidence

Ms. Hoening medical problems include arthritis and degenerative disc disease, low blood sugar, osteoporosis, anxiety and depression, temporomandibular joint disorder, a skin disorder, vision problems, and fibromyalgia. (Tr. 187-350). There is no medical evidence included in the record dated before 1997. The record indicates that from 1997 to 2003 Ms. Hoening was primarily treated by Milaca Chiropractic Center and several physicians and specialists affiliated with Mille Lacs Health System and Mille Lacs Family Clinic. (Tr.187-350)

#### i. Bone, Joint, and Back Problems.

In July 1997 Ms. Hoening complained of hip pain, which her physician concluded may be due to excessive activity including sit-ups and pushups. (Tr. 249). In September 1997 she complained of chronic back pain and received a Toradol injection, a prescription for Percocet and

was referred to an orthopedic specialist, Robert A. Wengler, M.D. (Tr. 248-49). Dr. Wengler found back and nerve pain and suspected an L4-5 disc lesion. (Tr. 247). A computerized axial tomography ("CAT") scan showed "rather significant" degenerative disc disease at L5-S1 but no evidence of significant disc protrusion at any level "particularly the patient's diseased L5-S1 disc." (Tr. 254). The CAT scan did reveal some "minor" degenerative changes in the apophyseal joints. (Tr. 254).

In January 1998 Ms. Hoening visited the emergency room complaining of a back spasm and hospital records indicate that she had a history of degenerative disc disease and a herniated disc twelve years earlier. (Tr. 188). She was prescribed pain medication and anti-inflammatory medication. (Tr. 188). In February 1998 she complained to her physician, Dr. Patty Hook, of leg, neck and joint pain. (Tr. 246). Dr. Hook prescribed Percocet for chronic neck pain Ms. Hoening experienced after receiving a chiropractic hip adjustment. (Tr. 206). A cervical spine x-ray showed mild degenerative joint disorder of the facets but an otherwise normal cervical spine. (Tr. 214). Ms. Hoening also visited the emergency room in February and the physician noted that it was likely Ms. Hoening suffered from severe osteoporosis and multiple musculoskeletal pains. (Tr. 206). He prescribed an estrogen patch and bone density scan. (Tr. 206).

In February 1999, physical therapy notes indicate that Ms. Hoening complained of pain and pressure in her neck and back, headaches, as well as difficulty sleeping. (Tr. 207). Her therapist, Barbara Rein, PT, scheduled Ms. Hoening for an osteoporosis program and suggested an exercise program. (Tr. 207). Later physical therapy notes indicated Ms. Hoening's complained of low back pain radiating into her abdomen. (Tr. 205). Ms. Hoening also complained of headache and neck pain. (Tr. 204). A CAT scan on March 5, 1999 showed some mild atrophy but otherwise normal head scan. (Tr. 204).

In 2000, Ms. Hoening asked her doctor to fill out a form for "Medical Assistance and General Assistance." (Tr. 243). Thomas H. Bracken, M.D. observed decreased range of motion in her left arm, osteoporosis by history, degenerative joint disease "to the point that [was] debilitating for her" and a history of "disabling" degenerative disc disease. (Tr. 243). Later that year, after complaints of hip and neck pain, Cathy Donovan, M.D. pointed to Ms. Hoening's osteoporosis and diagnosed Ms. Hoening with fibromyalgia, describing her pain as "much greater than her x-rays would bear out." (Tr. 242).

Ms. Hoening returned to Dr. Wengler on September 20, 2000 with complaints of back and neck pain. (Tr. 241). Ms. Hoening described "several unusual episodes where . . . her legs collapse[d] for no apparent reason and she [fell]." (Tr. 241). Dr. Wengler observed possible minimal narrowing of the C4-5 disc with healthy vertebra but marked narrowing of the L5-S1 space and noted that the bone appeared to be affected by osteoporosis. (Tr. 241). Dr. Wengler diagnosed possible cervical disc syndrome with C6 radiculopathy in the upper left extremity, low back pain with left lower extremity sciatica, and possible stenosis and lesion probably at the L5-S1 level. (Tr. 241). Dr. Wengler ordered Ms. Hoening to undergo magnetic resonance imaging ("MRI"). (Tr. 241). Ms. Hoening's MRI revealed mild degenerative disc disease at L1-L2 and L5-S1 and mild central disc bulge present at the L5-S1 level without significant nerve root compression or canal compromise. (Tr. 250-51). X-rays at this time revealed bone demineralization, mild joint space narrowing consistent with mild degenerative disc disease, and associated degenerative arthritic changes of the facet joints. (Tr. 253). A bone density scan ordered by Dr. Donovan revealed a significantly increased risk of fracture to the lower spine and above average risk of fracture in the hip. (Tr. 252). However Dr. Donovan was unable to determine whether the scan showed that Ms.

Hoening's osteoporosis was improving or getting worse due to her inability to obtain prior medical records. (Tr. 240). On October 27, 2000, Dr. Donovan found Ms. Hoening's fibromyalgia improving with Amitriptyline and suggested physical therapy to help both Ms. Hoening's fibromyalgia and her osteoporosis. (Tr. 278).

In 2001, Dr. Donovan determined that Ms. Hoening's fibromyalgia was at least partially exacerbated due to Ms. Hoening's difficulty in receiving physical therapy. (Tr. 278). On February 9, 2001, Ms. Hoening had a physical therapy evaluation which suggested her prognosis was "good". (Tr. 257). During that evaluation, Ms. Hoening noted that she was taking medication for her fibromyalgia, and that it had "been extremely helpful in decreasing her pain complaints." (Tr. 257). At a rheumatology consultation at the arthritis clinic at Mille Lacs Health Care Center Ms. Hoening's described her complaints to Erskine M. Caperton, M.D. of burning discomfort in her shoulders and along her bra line and left hip and leg, jerking sensations in her muscles, numbness in her leg and fatigue. (Tr. 259). Dr. Caperton found it was difficult to get Ms. Hoening to "focus away from her diagnosis" and describe her symptoms. (Tr. 259). He diagnosed osteoporosis that likely stemmed from her "very early" complete hysterectomy and fibromyalgia. (Tr. 259). Dr. Caperton opined it would take "vigorous" exercise to help improve Ms. Hoening's condition. (Tr. 259).

Ms. Hoening met with Dr. Donovan again on July 17, 2001 regarding continuing lower back pain. Dr. Donovan diagnosed a lower back strain and suggested a epidural steroid injection to enable Ms. Hoening to continue to participate in the walking program that was part of her physical therapy. (Tr. 277). The injection provided relief and Ms. Hoening received five similar injections in 2001 and 2002. (Tr. 261-68, 277). X-rays taken during this period showed degenerative changes between the L5 and S1 vertebrae spine but no changes from X-rays taken a year earlier. (Tr. 291).

Ms. Hoening suffered further back pain on October 18, 2001 and Dr. Donovan believed the new symptoms suggested recurrent herniation. (Tr. 277). She scheduled Ms. Hoening for an MRI that revealed "mild" spinal canal stenosis at L5-S1 with "mild" deformity of the S1 nerve roots as a result of a "broad-based" central discogenic spur. (Tr. 277, 290). A later maintenance exam found Ms. Hoening's back pain was "doing quite well." (Tr. 276).

In early 2002, Ms. Hoening complained of increased back pain and Dr. Donovan confirmed earlier diagnoses of degenerative disc disease, fibromyalgia, and osteoporosis. (Tr. 274-75). Dr. Donovon provided Medrol and ordered more epidural steroid injections. (Tr. 274-75). An MRI conducted to assess worsening low back pain indicated "slightly" increased central protrusion as well as in the left lateral protrusion although the degree of increase was characterized as "mild". (Tr. 286). Ms. Hoening continued to suffer back pain and consulted a specialist Peter A. Schmitz, M.D. of Northern Orthopedics, LTD. (Tr. 350). Dr. Schmitz found her back had limited range of motion and parvertebral tenderness. (Tr. 350). An MRI revealed facet joint arthrosis and impingement on the left and right sides. (Tr. 350). Dr. Schmitz recommended more injections and determined that if Ms. Hoening's symptoms did not improve surgery might be necessary. (Tr. 350).

In 2003, Ms. Hoening continued to complain of pain in her back and shoulder and Dr. Donovan supplied more medication (Tr. 272). An x-ray of Ms. Hoening's left shoulder revealed no problems (Tr. 284). Ms. Hoening again saw Dr. Schmitz who diagnosed her with a ruptured disc at L4-5 on the left side with spurs. (Tr. 314). Dr. Schmitz suggested that Ms. Hoening either needed to live with her pain or consider back surgery. (Tr. 314). Ms. Hoening underwent fasciectomy surgery with a disc excision at L4-5 on the left side in March of 2003 and was given instructions regarding post-surgery exercise and limitations on use of her back. (Tr. 309-10). After a recovery

period the surgery proved effective and caused a "marked" decrease in back pain and discomfort. (Tr. 305-06, 309).

### ii. Other Medical Problems

In July 1997, Ms. Hoening complained of a rash. Her doctor believed the rash to be consistent with insect bites. (Tr. 249). Ms. Hoening also complained of a skin condition producing sores on her face and body in 1999 and that skin condition was diagnosed as impetigo. (Tr. 245).

In 1998, her doctor noted crying and mood swings and prescribed Premarin, noting Ms. Hoening's previous hysterectomy. (Tr. 246). In 1999, Ms. Hoening's physical therapist, Barbara Rein, PT, observed that Ms. Hoening was depressed and having problems coping with her situation. (Tr. 207). In both 1998 and 2001, Ms. Hoening complained of pain in her jaw and was diagnosed temporomandibular joint disorder. (Tr. 245, 278).

Ms. Hoening also has had vision problems and was treated by professionals at the Wal-Mart vision center. (Tr. 196-203). In 1999, tests indicated Ms. Hoening had elevated blood sugar and her doctor helped her implement a plan to manage her blood sugar level. (Tr. 244).

Ms. Hoening was referred to Dennis Anderson, M.A. for a psychological evaluation which occurred on June 29, 2000. (Tr. 216-222). After his interview with Ms. Hoening, Mr. Anderson noted that Ms. Hoening was intellectually functioning well within the normal range and had memory commensurate with her IQ. (Tr. 220). Mr. Anderson found evidence of generalized anxiety disorder and occasional panic attacks with some specific phobias. (Tr. 220-21). He found Ms. Hoening had the ability to care for herself but that her rate and pace of work were somewhat slowed. (Tr. 220). Mr. Anderson believed that Ms. Hoening had a "restricted" ability to tolerate increased levels of stress. (Tr. 221) He also believed she had a personality pattern that would "tend to be a poor

candidate for traditional psychotherapy and often tend to physician shop until they find medical personnel who agree with their own organic formulations of their difficulty." (Tr. 221).

        **iii.**        **State Agency Review**

On February 22, 2000, a state agency physician reviewed Ms. Hoening's medical record and on August 14, 2000, the disability determination was reconsidered. (Tr. 58-62). Initially Jeff Gorman, M.D. concluded that in combination, Ms. Hoening's impairments were not severe enough to be disabling. (Tr. 59). Sharon Frederiksen, Ph.D., another state agency expert, reviewed additional psychological evidence submitted after Ms. Hoening's June, 2000 psychological interview. (Tr. 60-61). Dr. Frederiksen determined that the conclusions reached by the state agency personnel in February, 2000 were correct. (Tr. 61).

        **C.**        **Ms. Hoening's Testimony**

At the administrative hearing on July 15, 2003, Ms. Hoening testified regarding her impairments and daily activities. (Tr. 32-46). She testified that she could not work or drive due mainly to back pain and vision problems. (Tr. 35-37). Ms. Hoening indicated that walking was difficult and she could not sit for long periods of time. (Tr. 40-41). She testified that she could not lift more than 10 pounds, could not bend over at the waist, could not reach above her head, and could not squat or kneel due to back pain. (Tr. 41). Ms. Hoening further testified that she could not easily lift and grasp small objects like a cup or a glass due to arthritis. (Tr. 241). She explained that she was unable to do household chores such as cooking, laundry, shopping without her husband's help but that she was able to do the dishes unassisted. (Tr. 42). Ms. Hoening also indicated that she was able to bathe and dress herself. (Tr. 44).

        **D.**        **Vocational Expert Testimony**

Wayne Onken testified as a neutral vocational expert ("VE") at the administrative hearing on July 15, 2003. (Tr. 49-57). Mr. Onken explained that Ms. Hoening's work experience was unclear but that her past work as a nurse's aid would be classified as semi-skilled with medium level physical demands. (Tr. 50). In addition, Mr. Onken testified that Ms. Hoening's transferable skills were healthcare in the medical field. (Tr. 50).

The ALJ asked Mr. Onken to consider whether there would be any jobs in the regional or national economy that a similarly situated person could do during the period of 1999 until the date of the hearing, with limitations and with Ms. Hoening's age, education, and past work experience. The ALJ asked Mr. Onken to consider an individual who: could only lifting twenty pounds occasionally and ten pounds frequently; had the ability to stand or walk using a cane a total of six hours in an eight-hour day; had the ability to sit six hours a day with a sit/stand option, whereby she could sit or stand as needed during the course of the day; and could not make continuous use of her hands and fingers for gripping and grasping things but had the ability to do so infrequently. (Tr. 51-52). Mr. Onken stated such a hypothetical person would be able to work within several recognized job categories. (Tr. 52). Mr. Onken testified that the hypothetical person would be able to work in several unskilled positions at the light level, including positions as a cashier II, a mail clerk, or a position in the semi-skilled job of gate guard. (Tr. 52). Mr. Onken further testified that, taken together, there were around 4,500 of these types of jobs in Minnesota. (Tr. 52).

Changing the hypothetical slightly, the ALJ asked Mr. Onken what positions would be available if the hypothetical person was limited to lifting ten pounds occasionally and five pounds frequently and limited to sitting for six our of eight hours in a day with a sit stand option. (Tr. 53). Mr. Onken replied that this change would eliminate two of the jobs he mentioned but that there

would be other unskilled, light jobs available including around 1,000 cashier II jobs available. (Tr. 53). He also added that there would be 4,500 telemarketer positions, surveillance system monitor positions and telephone answering service operator jobs at the lowest level of semi-skilled available with these hypothetical limitations. (Tr. 53).

    **E.**    **Medical Expert Testimony**

Yang Wang, M.D. testified as a neutral medical expert ("ME") at the administrative hearing. (Tr. 46-49). Dr. Wang explained that he had reviewed Ms. Hoening's file and found some of the evidence conflicting. (Tr. 46). While he found that some notations indicated arthritis, a rheumatological evaluation did not find any evidence of significant arthritis and x-rays of the shoulder and other parts did not show arthritic changes. (Tr. 46). He did not question that Ms. Hoening had "diffuse pain" but found difficulty in pointing to its source. (Tr. 46). Dr. Wang also viewed Ms. Hoening's back pain as "problematical" because she had three "x-rays dyed [sic] injections" in the low back and two showed no improvement while one did show improvement. (Tr. 46-47). Dr. Wang concluded that while x-rays showed some evidence of a facet disorder and her back surgery was for a fasciectomy—because of the possibility that the facet might be impinging on the nerve roots—this diagnosis was not definite. (Tr. 47).

Dr. Wang noted that osteoporosis is not ordinarily symptomatic until bones break. (Tr. 47). Dr. Wang concluded that Ms. Hoening's hysterectomy would be a good reason to have severe osteoporosis, it was "a little unclear" how to characterize her osteoporosis. (Tr. 47-48). Dr. Wang briefly discussed Ms. Hoening's psychological evaluation with Dennis Anderson, M.A. noting Mr. Anderson's diagnosis of a generalized anxiety disorder. (Tr. 47). The ALJ asked Dr. Wang if any of Ms. Hoening's conditions meet or equal any of the listings in the listings by the blue book. Dr.

Wang replied that they do not but added that he did not doubt her symptoms and that Ms. Hoening was in considerable stress. (Tr. 49).

**F.     ALJ's Decision**

In determining whether or not Ms. Hoening was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 404.1520. In the first step of the analysis, the ALJ determined that Ms. Hoening had not engaged in substantial gainful activity since 1983 and so had not engaged in such activity since her onset date—considered for this application as November 29, 1999, the date she would be eligible to receive benefits. (Tr. 19-20).

In the second and third steps of the evaluation process, the ALJ determined whether Ms. Hoening suffered a "severe" physical or mental impairment. (Tr. 20-25). A severe impairment is defined as one that significantly limits the individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 416.920(c); 416.921. The ALJ found Ms. Hoening severely physically impaired with degenerative disc disease, arthritis, osteoporosis by history, and fibromyalgia. (Tr. 20). However the ALJ concurred with Dr. Wang's expert testimony that Ms. Hoening's impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, subpart P of 20 C.F.R. 404.1520(d). (Tr. 20).

The ALJ also considered whether Ms. Hoening had any medically determinable mental impairments within the analysis set forth in 20 C.F.R. 416.920a. (Tr. 20). The ALJ found that Ms. Hoening was subject to an anxiety-related disorder and evaluated it under Section 12.06 of the listing of impairments. (Tr. 20-21). To determine whether this disorder limited Ms. Hoening's functioning the ALJ considered the four broad functional areas outlined in Appendix 1 and concluded that her testimony regarding limitations in her daily activities indicated that her

limitations were a result of her physical impairments rather than any medically determinable mental impairment. (Tr. 21-22). The ALJ found that the limitations resulting from the mental impairment indicated that the anxiety-related disorder did not result in more than a minimal limitation of Ms. Hoening's ability to engage in work activities and therefore, was not a severe impairment. (Tr. 23).

In the fourth and fifth steps of the evaluative process, the ALJ determined whether Ms. Hoening's RFC permitted her to perform her past relevant work or any other work existing in significant numbers in the national economy. (Tr. 23). The ALJ determined that Ms. Hoening had no past relevant work experience. (Tr. 26). He further concluded that she retained the RFC to lift twenty pounds occasionally and ten pounds frequently, could stand/walk six hours or sit six hours in an eight-hour work day with a sit/stand option as needed, but was precluded from jobs with any continual gripping or grasping of items. (Tr. 23). In arriving at this RFC, the ALJ noted that he considered, but accorded "little weight," to the opinions of state agency medical consultants. (Tr. 24) The ALJ determined that at the time of her application Ms. Hoening was 47 years old, which is considered a younger individual. (Tr. 28) See 20 C.F.R. § 404.1563(c). He also found that the course of medical treatment and the use of medication in this case were "not consistent with disabling levels of pain." (Tr. 26). Based on the testimony of the VE the ALJ determined that Ms. Hoening could perform light work as a cashier II, a mail clerk, and a gate guard which fell within a hypothetical corresponding to Ms. Hoening's age, educational background, work experience, and RFC. (Tr. 27). As a result, the ALJ concluded Ms. Hoening did not suffer from a "disability" as defined by the Social Security Act at any time through the date of his decision and denied her application for SSI. (Tr. 27).

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Richardson v. Perales, 403 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).  Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo.  See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

### IV. CONCLUSIONS OF LAW

**A.   The Administrative Law Judge Failed to Obtain Additional Evidence Necessary to Determine Ms. Hoening's Residual Functioning Capacity.**

Ms. Hoening testified at the hearing before ALJ Tierney that she could not lift more than ten pounds, that she could not sit for six hours in an eight hour day, and generally that her multiple

problems precluded her from performing the hypothetical posed by the ALJ. (Tr. 41, 51-56). This hypothetical ultimately formed the basis of the ALJ's determination of Ms. Hoening's RFC. (Tr. 23, 51-53). The ALJ found that Ms. Hoening could lift twenty pounds occasionally and ten pounds frequently, stand or walk six hours or sit six hours in an eight-hour work day with a sit/stand option as needed, but found she was precluded from any continual gripping or grasping of items. (Tr. 23). The ALJ further concluded, consistent with those physical restrictions, that Ms. Hoening could engage in light work (TR. 23). In making this finding, the ALJ considered the evidence in the record including medical evidence, Ms. Hoening's testimony, the VE's testimony, and Ms. Hoening's credibility (Tr. 19-28).

Ms. Hoening contends that the ALJ erred in determining her physical RFC by failing to obtain opinions from Dr. Wang, the medical expert, or from her treating physicians regarding her RFC. (Pl.'s Mem. at 13). Ms. Hoening opines that the absence of a medical opinion in the record directly addressing RFC, combined with discrepancies in the record observed by Dr. Wang reveal that the ALJ's RFC analysis "lacks foundation". (Pl.'s Mem. at 14). The Commissioner responds that the ALJ relied on a "good deal" of medical evidence, including the opinion of state agency reviewing physicians and therefore the RFC is valid. (Def.'s Mem. at 12-13).

A social security applicant has the initial burden of proving inability to perform past relevant work. Once it has been shown that the applicant cannot perform her past relevant work or has no past relevant work experience the burden shifts to the Commissioner to prove that notwithstanding the claimant's severe impairment she has the RFC to perform other substantial gainful activity that exists in the national economy. (Tr. 27); See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Nimick v. Sec'y of Health & Human Serv., 887 F.2d 864, 868 (8th Cir. 1989). While the ALJ

is responsible for assessing RFC based on all the relevant evidence, RFC is ultimately a medical question. See Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). To determine RFC the ALJ must consider at least some supporting evidence from a medical professional and may need to obtain additional medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 712.  As the Eighth Circuit noted in Nevland v. Apfel, the key issue in regard to RFC is not whether the claimant has a medial condition but how that condition is "now affecting his ability to function physically."  204 F.3d 853, 858 (8th Cir. 2000) (quoting Ford v. Sec'ry of Health and Human Serv., 662 F.Supp. 954, 956 (W.D.Ark.1987)).  Thus, "[a]n administrative law judge may not draw upon his own inferences from medical reports" to determine RFC but must "consider at least some supporting evidence from a professional."  Nevland, 204 F.3d at 858 (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)); Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001).

In the present case, the ALJ did conduct a thorough independent review of the medical evidence in the record and considered Ms. Hoening's testimony as well as the assessment of the medical evidence by the ME. (Tr. 20-27). However the only evidence cited speaking directly to Ms. Hoening's physical RFC is the assessment of a state agency reviewing physician which was afforded "little weight" by the ALJ. (Tr. 24).  The alleged physical RFC assessment cited is only a reference to a physical RFC assessment by another physician conducting a psychological assessment.  (Tr. 228).  A physical RFC assessment is not included in the record.  No medical evidence, in fact, directly contradicts Ms. Hoening's claims regarding her inability to perform at the RFC determined by the ALJ.  (Tr. 40-46).

In Nevland, the Eighth Circuit instructed the district court to remand the case to the

Commissioner when the ALJ relied solely on a consulting physician because reliance "on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC . . . . [did] not satisfy the ALJ's duty to fully and fairly develop the record." Nevland, 204 F.3d at 858. Here, the record does not include the consulting physicians' assessment and no other medical opinion speaks directly to Ms. Hoening's RFC. The record is thus insufficient to provide substantial evidence to meet the Commissioner's burden to prove RFC.

The ALJ's hypothetical was based on the RFC found to be supported by insufficient medical evidence. (Tr. 23-27, 51-53). The hypothetical posed to the vocational expert reflected the ALJ's flawed RFC analysis and therefore could not provide an accurate basis for the VE's testimony. (Tr. 23-27, 51-53) In light of this, the ALJ's hypothetical was not supported by substantial evidence.

  **B.** **Ms. Hoening Has Failed to Show That the Evidence Overwhelmingly Points to the Conclusion That She is Disabled.**

Ms. Hoening points out that where the evidence of record overwhelming shows that she is disabled it is not necessary to remand the matter to the Social Security Administration. (Pl.'s Mem. at 17). It is well settled that if a reviewing court finds that "further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." Hutsell, 259 F.3d at 714 (quoting Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir.1984)). In Hutsell the Eighth Circuit declined to remand and instead awarded benefits to the claimant because the "medical evidence uniformly indicate[d] that . . .any sustained work [wa]s more than" the claimant could handle. Hutsell, 259 F.3d at 713.

In this case, Ms. Hoening has failed to show that the "clear weight of the evidence points to a conclusion that" the she is disabled. Hutsell, 259 F.3d at 714. But this Court nevertheless cannot

hold that the ALJ's findings in regard to Ms. Hoening's RFC are supported by sufficient medical evidence and so the Court finds that remand is appropriate.  See <u>Nevland</u>, 204 F.3d at 858.  Since this case is remanded to the Commissioner for further proceedings, the other issues raised on appeal are not addressed.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [Docket No. 9] be **DENIED**;

2. Defendant's Motion for Summary Judgment [Docket No. 16] be **DENIED**;

3. The case be **REMANDED** to the Commissioner of Social Security for further proceedings consistent with this Report and Recommendation.


DATED: July 6, 2006                         s/ *Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 25, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.